May it please the Court, my name is Glenn Neamey. I'm here to represent Richard Samayoa. All crimes that reach this Court, all death penalty crimes, carry with it obviously a very terrible set of events behind them. However, as stated by the United States Supreme Court in Porter v. McCallum, it is the gauging of moral culpability of an individual defendant by his individual jury that distinguishes one of his cases from the other. And I think before I start on this, I want to make one thing clear that I perhaps had not made clear to this Court in the briefings. What I am seeking here is an evidentiary hearing. I am seeking this Court to return this matter to the District Court so I can further the record. It's clear that a petitioner is entitled to... Well, the first prong on Strickland, the District Court already indicated that no evidentiary hearing was necessary. I want it on both prongs. What would you prove as to the second prong if you had a hearing? What I would prove to the second prong goes back to the individual moral culpability. And I think... Can you tell me specifically what you would prove? Specifically, I want to develop the record by calling these witnesses. Because I think that the witnesses that we submitted in the affidavit... Which witnesses and what would they testify to? I would call Marie Alicorn. I would call virtually all of the witnesses that were members of Mr. Samuel's family. And this is what they would testify to. They would testify to the fact that Mr. Samuel did not really grow up in a family. He grew up in what amounted to a cult. A toxic cult from which there was no escape. Isn't that fact already in evidence? Yes, it's already in evidence. So what new stuff would you produce? Well, new stuff, I think what... The reason why I need an evidentiary hearing is I would want the District Court to see these witnesses. Because I saw these witnesses. I saw these people. I had an opportunity to go out and interview these people. And in order for the District Court judge to make a judgment on what effect these witnesses would have had on a jury if they would have been allowed to testify at the first hearing, they have to see these people. I saw them tremble when they talked to me, when they talked about this family. I saw them weep when they spoke to me, when they spoke about this family. I saw the pain in their hearts that simply can't come across in a piece of paper. And would they say anything different, Your Honor? I don't know if they would say anything different. But certainly the impact of their testimony before the District Court is absolutely essential. I'm sorry, Your Honor. You're still continuing to be abstract rather than concrete. I'm just not understanding. Are you saying these are better witnesses? No, Your Honor. They're not better witnesses. If the court wishes me to go through exactly what they would say, if that was the question, I'm sorry, Your Honor. I misunderstood your question. Well, we know what they would say because they produced declarations, didn't they? Yes, they did. Would they say anything else, anything different? I don't know exactly until further, you know, I would have to further question them. But basically they would say the same thing. What was it that, of what they say that was not presented to the first jury? What would be new? What was not presented to the first jury, basically everything. The first jury was presented a case that was, the only jury, was presented a case that was essentially 180 degrees opposite from what the reality was. They were told that my client was, in essence, a black sheep of a good family who committed these crimes because he was sociopathic, that there was no other reason for him to have done this, that counsel actually told the jury that he had no idea why the client committed these crimes and actually asked the jury to please come up with a reason why my client did this because frankly I can't come up with a reason. However... Let me get back because I think you could answer this in one question. The witnesses you want to present to the jury, you have submitted affidavits from each of them. That's correct, Your Honor. And none of those witnesses testified before the original jury. That's correct, Your Honor. Okay. But what you're asking now is to have it go back to district court so that the district judge can hear, not the jury, but the district judge. Of course. I mean, obviously there is no jury left to hear. The only one who can make a decision whether Mr. Samuel gets another jury is eventually the district court and eventually the courts above. And if I understand you correctly, the only thing new that would come out would be their demeanor. I think it's more than simple demeanor. Well, I thought you said their trembling and their... Oh, yes. What else? It's not demeanor in the way they sit or the way they hold themselves. I think it's demeanor in the sense that the impact that they would have had on a jury. I think it all boils down to the jury. It all boils down to whether a jury would have looked at what counsel did not present because of the lack of investigation and say, judging the moral culpability of this man, he does not deserve to die. And he simply can't... I don't believe you can do that simply by piece of paper, perhaps as closely as you can. And obviously if this court's willing to grant me relief without sending it back to the district court, I'm not going to petition for an inbound hearing. If you think only a district judge can, would you be willing to accept a district judge's view of those witnesses and say the same thing if he disagreed with you? If the court's asking whether I'd be willing to wait... Whether you're serious about what you're saying that a district judge... Let me put it this way, Your Honor. Perhaps the reason I said that was this court obviously does not hear witnesses. So the district court is a court of what we would call the court of general jurisdiction in the state court system. So obviously if Judge Whalen decides otherwise, I'm not waiting for him to come back out here and say he was wrong. I didn't think you really meant that. No, I wasn't. And if I gave that impression, Your Honor, I must have been thinking of something else. Okay, well, I think we probably understand that part because you want to present the evidence that the district court had before it in the form of affidavits, which the jury did not hear. That's correct. You want to send back to the district judge who will see the witnesses. And, Your Honor, the law seems to say that we're entitled to do that. The state court, the California Supreme Court, never gave Mr. Samuel an opportunity to have an evidentiary hearing. He has proven his case. We have proven his case. We have made a culpable claim. And we have alleged facts which, if accepted to be true, would entitle him to release. So Mr. Samuel is entitled to an evidentiary hearing. Now, if the court wants me to go back and to explain exactly what these witnesses would say that would show that Mr. Samuel has suffered prejudice, I'd be glad to do so at this time. If you could quickly go through that and the things that the jury did not hear. Yes, sir. Yes, sir. I'd be happy to. The jury heard absolutely nothing about the fact that alcohol and drugs were virtually forced upon Mr. Samuel at a very early age. Now, the judge assumed that to be true, as I understand it. The district court judge assumed that to be true. Okay, so you've got that point already on your side of the ledger. Yes. Okay. Well, the court reviews it under de novo standards, so I guess it is kind of on my side. Everything you're going to tell us in answer to Judge Kuczynski's question, the district court had before it in the way of affidavit. That's correct, Your Honor. And took to be true. And took to be true. Okay. But I'm directly answering the chief judge at this point, and the chief judge wants to hear what the truth is. Go ahead, sir. Just to make sure. Okay. I began to mention – There were some things that did come up before the jury. I just want to make sure that we're identifying – Okay. The alcohol and the drug use, where his family basically ran on alcohol fumes. They took drugs constantly. They encouraged a drink at the age of 12, which turned Mr. Samioa basically into a lifelong drug user. None of this was even mentioned. The only thing the jury heard about the family was, in essence, that the family was such a law-abiding bunch of people that they actually turned their own son in for committing this crime. And essentially what the jury was told is, you should save Richard Samioa because his mother and sisters are such good people. In addition to – this only began, the drugs and the alcohol. This entire family, the entire way of life that this family lived, its whole ethos by, was violent. Everything was violent. Fathers would beat sons, including Richard. Richard was severely beaten by his father. But more than that, Richard Samioa, from the time he was a little boy, witnessed sons beating fathers, grandsons beating grandfathers, grandfathers beating their grandchildren. Every time the family got together, somebody's blood wound up on the floor. And as Dr. Hubbard would say, it became – violence became a way of life for this man. There was absolutely no inkling of this before the jury. All the jury heard was that he was a sociopath. And this was from counsel's own witnesses. And as any trial lawyer knows, there is nothing worse than a sociopath. Well, they also heard he had some organic – They heard they had some organic brain damage, but this was a very, very weak, weak presentation for a couple of reasons. For one thing, Saul Sadek, who was the chief witness for the defense who testified to this, also turned around and he said immediately after testifying on cross-examination, he said, Well, he may have had brain damage, but Mr. Samioa learned to compensate for this. In addition, in talking about the brain damage, in the guilt phase, in the penalty phase, that was the guilt phase. That was intended to show that the defendant, Mr. Samioa, had no intention to commit the crime, because at the time you had to show intent to be found in special circumstances to be found true. In essence, in the penalty phase, defense attorney just walked away from the whole thing, because he stated to the jury, You know, I don't know whether you believe in this brain damage or not. I don't know whether or not you want to even consider this brain damage or not. But it's obvious that something was wrong with my client. But they provided nothing that was wrong with the client. And they actually invited the jury. Mr. Poppins actually invited the jury to go back there and try to figure out for him what was wrong with the client. I just want to throw something more to the side. So you've got your alcohol use, drug use in the family. You've got the beatings, the violence. Okay. What else? Okay. You might finish off on the violence, what happened to the defendant, what his father did to him. Oh, the defendant's father. I'll answer that question specifically. I don't know. Again, it's more about his mother and father. The father would hold his hand, on one occasion held his hand over a burner and burnt Mr. Samuel until he screamed with pain. Mr. Samuel, a senior, was always ready with the belt. According to Benny Girdley, and this was uncontroverted by anything that the respondent put forward, his father would beat him between five and ten times a month. His father had absolutely no patience with him. He treated his siblings, Richard's siblings, much better than he treated Richard. He beat him with a belt. And Richard did not even want to cry because he wouldn't give his father the satisfaction. Basically, Richard, I said this before, but it can't be emphasized more often, is that ultimately the type of person he became, violence became a way of life for this man. He knew no other way to live. That's what he saw. Going back to his mother and father, and I think this is very, very important, the people who filed declarations say the complete opposite of what was said at trial. And what the jury was supposed to judge this man's moral culpability. The witnesses said the mother was cold. She never said I love you to her son, Richard, the oldest. She berated him constantly. And I think one very telling sad point is that she hated her own grandchild because her grandchild looked like Richard's wife, who she also hated. This woman didn't know whether Richard was even special ed, says in her declaration, didn't know whether her own son was in special ed, didn't know whether her own son had any, who his friends were, if he had friends. She knew nothing about her own son. The father was not only violent, but more important than this, you have to look at the big picture, and the big picture is here. This extended family would get together, and I'm sure we all have extended families that get together, and occasionally there's an argument or two between the cousins. In this extended family, every time they got together, and Richard Samuel was there all the time, every time they got together, Grandpa would get hit over the head with a blender, or somebody would throw a beer can in somebody else's face. And the response of Mr. Samuel Sr. to all this was to drink himself into a stupor, urinate in his pants, and fall asleep. You know, Your Honor, I have been blessed to have such children of my own, and I think it's okay if we as parents make mistakes, but the greatest sin of all as a parent is failure to stand guard over your child. And failure to stand guard, Your Honor, failure to protect. Who stood guard over Richard Samuel? Child molesters, pederasts, criminals. Was there any evidence of molestation? Yes, Your Honor. There was an enormous amount of evidence from four or five of these declarants. Richard stated to both Bernadine Severance and Marie Alicant that he had been molested by Uncle Chad, and there was no reason to believe that this didn't take place because virtually everybody in the family said that this wasn't just casual molestation. This was, I hate to be flip about this, but I don't even know any other way to put it. This seemed to be the family hobby. It went on from generation to generation. Let's talk about Uncle Chad for a second. Yes. I understand that there's some contradiction about whether he actually was molested by Uncle Chad or Uncle Chad tried to lure him and it never actually was consummated. Is that true? There is a contradiction in the record about that? Is there a contradiction? Yes, there's a contradiction to some extent, and I imagine if you're saying, did somebody allege,  Well, it's not what they allege. They have a witness who said that your guy said that he never actually was molested. He was Uncle Alex or Uncle Chad tried to molest him, but it never came to pass. Yes, he said that. However, Your Honor, we also have other, Dr. Hubbard, Dr. White, Mr. Rucker, who all say what is very obvious to all of us who have been in this business for a while, that young men don't readily admit to being molested by older men. Granted. My point is that, or the point they're making is that uncontradicted evidence of molestation is more powerful than equivocal or contradictory evidence of molestation. Two points to that, Your Honor. One, that's why we need an evidentiary hearing. Number two, let's even, I will not concede that he was not molested because he told his two female cousins that he was, and I can't imagine why he would tell your two female cousins that you were molested. I can't imagine why a lot of things he does, but I mean, you know, there's a, the point is that it's not as clear cut as you are presenting it. That's one side of the story. There's another side of the story, which affects its persuasive value. Well, it also comes, it all comes directly to him, right? There's no eyewitness. There's no independent medical evidence. There's no contemporaneous complaint to the police. There's no statement from Uncle Chad. I mean, there's nothing like that to a third party. And everything, this is why I was asking you, was there evidence? There's his statement related to some of his relatives, right? Well, yes, Your Honor. I'm just asking. No, I understand that. Did I miss anything? For you to do so, of course you must. Did I miss anything? Well, you missed this, Your Honor, that in a family like Richard Samuel's family. I'm sorry. I don't mean did I miss the significance of it. I'm saying did I miss any proof, any item of evidence. Is there something that did not, for example, if for whatever reasons he chose to lie about this, would there be anything to back him up or anything to back up his support if he was Uncle Chad or did lay hands on him? Well, certainly there's the fact that the demolition that took place within the family was not discreet. It happened to virtually every young person, every member of his generation in the family. Indeed, it would be circumstantial evidence. They didn't all go and commit murder, did they? No, they didn't all commit murder, Your Honor, but virtually every one of them was seriously affected. And it states so in the declarations. Some became lifelong drug addicts. Others fell into crime. Marie Alicorn stated that if it wasn't for some man who took her out of this, who married her and took her out of this, she does not know what would have happened to her. There are other declarants who say that they still shake and shudder and are still terribly upset when they think about the family. No, obviously, Your Honor, not all of them went out. None of the others went out and committed murder, Your Honor. That's a given. I think that's a little simplistic. But that is a little bit of a simplistic way of looking at it. Not everybody was mistreated and not everybody who gets relief in this court. You have to prove that people similarly situated went out and committed murder. Does the court want to hear more about? At the time he told his cousins and didn't go to the police or report it to anyone else, how old was he? A little unclear with that. They were all around early teens. And I want to just jump on one thing, if I might, Your Honor. Why didn't anyone... Did the cousins report it to anyone else? No, that's exactly the point I was about to get to. Who could they report it to, Your Honor? This family, as Gretchen White said, was a closed system. No one got out alive, as Jim Morrison once said. No one got out of that family saying, who are they going to go to? Either you were one of three people in that family. You were the hunter, you were the hunted, or you facilitated the hunters. Those who didn't actually molest the children wouldn't even listen to the children when they say they were molested. So what good would going to the police have done? The school authorities, they complained to the police, they complained to other relatives. I mean, it is not unheard of. This would have happened in the, what, 70s? Yes, 70s. Yeah. I mean, this is not exactly 1650. The counterfeiter services existed. The school authorities, by that time, were quite active in pursuing complaints by children that they were being mistreated or being sexually molested by family members. So it wasn't possible. I mean, I'm not, I mean, you can argue that there may have been good reasons or a justifiable, that nobody complained about it, but it's not like it was impossible. It was almost impossible, Your Honor, and this is why. Richard Samuel wasn't the only child molested in that family. There were many children who were molested, and none of them, none of them went to the police. It's not as if he was, it's proof that he was perhaps making all of this up because he didn't go to the police. You certainly can't say that every one of these people, that Marie Alacon, Bernadette Severance, Bernie Gurley, every one of these people was making it up, and the proof that they were making it up is because they didn't go to the police. They didn't go to the police because under the individual circumstances of this family, number one, they couldn't go to the police, and number two, if they did go to the police, and Mr. and Mrs. Samuel, the parents, would turn around and say, we don't know anything about child molesting in this family, and I wonder what his father would have done to him if he beat him for nothing. What would they have done to little Richard if Richard would have come forward and said, I'm going, I'm going to the police, and said, my whole family is full of pederasts. Mr. Neamey, let's assume all of this is true, just as the district judge did. We still have to balance it against the facts of the crime, which are pretty atrocious, and also the significant aggravation, which is also pretty atrocious. How do we do this balancing? Your Honor, Porter pretty much describes exactly how you should do it. Porter begins to state, and I quote, this is not a case, referring to Porter, of course, where new evidence, quote, would barely have altered the sentencing profile presented to the sentence. This Court has granted relief on many, many occasions. You know, it takes a better mind than mine to compare which crime is more terrible than the next. I simply can't do that. But this Court has granted relief in similar situations to cases such as Karen. Those are pre-EDPA cases, aren't they? Yes, they are pre-EDPA cases. Okay, so for starters, we have to understand that we have to give the State Court ruling deference that we didn't have to do in those cases. Well, there are no facts. This is a 2254-D1 case. We have to find that the California court was unjustified. Right, which they didn't have to do in these cases in Karis and Sankowitz. But, I don't think... Is this case Pinholster? No, because I think that in this particular case, the gap between what was presented and what was not presented is so vast as compared to Pinholster. I mean, Pinholster, you had the whole situation where his lack of cooperation, his attitude towards counsel, and everything else like that. In this particular case, you have North and you have South. The jury heard South when the reality was North. I mean, Pinholster helps you, of course. On the other hand, the Supreme Court is going to serve in Pinholster, so we'll find out. There's a lot that they're going to have to decide. You have the situation where the mother testified and said it was Prigo's family and this guy is a black sheep. You have the situation where there were many family members who were not interviewed. I mean, there are some eerie similarities between your client's case and Pinholster's. And I would have thought you'd rely more heavily on it. I was going to ask you whether you think we ought to hold our decision in this case from the Supreme Court's ruling Pinholster. Well, obviously, Your Honor, Pinholster is up to four. I'm not asking, we're not asking. I'm sure Pinholster will decide certain issues. I think more importantly, Pinholster is going to decide various issues about whether new evidence can be presented. There's a lot of EDPA issues. I'm talking from a purely factual basis. Now, there's another case, of course, Harrington v. Richter, which is up before the Supreme Court as well, which basically asks when you have one of these postcard denials, does EDPA even apply? And I would certainly like to hear what the Supreme Court has to say about this. Well, then your answer to the judge should be yes. You should wait to hear. Then it's yes. You're quite correct, Your Honor. We should wait. I mean, if you'd like to hear about something, then your answer would be yes. I'd like to wait and hear about it. Yes, you're quite correct. And whether you would or not. There's also Richter. All right. There's also Richter. Yes, sir. The mid-range server, which deals with the duties of counsel and to investigate, right? Yes, it does, Your Honor. But, again, I'd go back, again, to the Supreme Court cases that are already in existence at this time, which go back to, fall back to Strickland. There is a duty to investigate. Whatever your answer is on the cases that have already been decided, and whatever we do, we're only a panel. That's correct. There's certainly going to be a petition for rehearing from the losing side. People are going to say, well, this doesn't – the question isn't answered. The Supreme Court is going to tell us soon. And if we don't say it, the losing side will go to the Supreme Court and say they've decided this case before your most recent ones. So I don't know what we're going to do. But I think in the long run, however – whatever we do, however we rule, before anything definitive happens, one of either you or the State are going to end up asking for further consideration in light of those cases. So the question was whether we should do it ourselves and wait for that, or whether you want the full court to do it, or whether you want the Supreme Court to do it. But somebody's going to see that those cases are considered at some point. All I can say, Your Honor, is at this point, on August 25th, 2010, before this particular panel, I believe we're entitled to an evidentiary hearing. What happens in the future, I very often don't fully understand what the Supreme Court says after they said it. I certainly don't understand what they say sometimes before they say it. And you're not likely to understand what we say either. Well, you're more immediate, Your Honor. I'll understand. You've got about a minute left. Do you want to say a few words? Yes, I would, Your Honor. Thank you very much. Thank you. Good afternoon, Your Honors. Annie Featherman Fraser on behalf of the Respondent. With respect to the First Pong and Strickland deficient performance, I'm going to start there. And with regard to performance, counsel's not deficient for failing to find mitigating evidence if after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence. And I think in this case, it's very clear that counsel didn't know about the evidence that's been presented in the habeas petition. And that's clear on what they presented. They presented declarations from the defense investigator, Miriam Passos, who definitively said Well, on the cases that, or cases from the Supreme Court, like Wiggins, and certainly our opinion, Pinhole, which summarized those cases that say, regardless of what you put on notice of, specifically, you have a responsibility as counsel to talk to family members. Absolutely. And even if, you know, just ask questions about childhood, and even if the defendant, I guess he's a defendant, even if the defendant's petitioner does not tell you there was a problem, counsel has a duty to talk to enough family members to get a good idea of what happened as childhood that might be mitigated. Absolutely. And in this case, that was done. You don't think that that was the case here? No. Defense counsel, Miriam Passos, the investigator, spoke to the defendant. He had four siblings. Each one of those siblings was spoken to by her. And this is in the declaration of their expert witness, Gretchen White. She said she relied on reports taken at the time from Miriam Passos. And there's some stuff from the witnesses themselves. We know she at least spoke to the mother, Richard Samioa, his two brothers, his two sisters, two aunts, an uncle, two or three cousins, his ex-wife. Didn't talk to Uncle Chester. Pardon? Didn't talk to Uncle Chester. No, we don't know where Uncle Chet was at the time. Didn't Miriam Passos get all these things? Miriam Passos did all that. Didn't Miriam Passos say that I just scratched the surface with my investigation? There were too many unknowns and we weren't ready for trial? That she believed that the lawyer should have continued the trial, that he didn't spend time with the defendant's family? They had to force him to go to see his grandmother? She did say that is in her declaration. But we do know she contacted numerous witnesses, as I mentioned. And we also know that Michael Hopkins, the lead defense counsel, also spoke to the mother, the siblings, an aunt. The aunt said that he didn't want to hear what I had to say. There is a declaration from one of the aunts that stated that. And the context of that is not clear. There is no declaration stating that Michael Hopkins wasn't interested in the bad family abuse. The context of that declaration- She says in the declaration the attorney told me he did not want to hear the negative things about Richard or the family. The one aunt did say that. Correct. But we do know that he did speak to many family members. And we know that he didn't know about the abuse. Maryam Pasha, she was interested in learning about the abuse. She was an experienced investigator. She was looking into the penalty phase mitigation. She spoke to the numerous witnesses I've mentioned. And she still, in her declaration, said, I did not know about the abuse. So you have to look at what was reasonable. There isn't a limitless obligation to continue to investigate leads that aren't going anywhere. What you know from the- But it was the investigator herself who said that she felt that they hadn't-she just scratched the surface. They hadn't spent enough time on it. And the lawyer should have continued the trial. They should have been more investigating. That's what the investigator said. She did say that. What we do know, though, in addition to that, is that of the witnesses and the declarations that were submitted, if you look at those carefully, what you'll see is the immediate family members do not talk about the same types of things that the extended family members talk about. The immediate family-and let me just talk about the molest, because there's a lot of questions about the molest. The evidence about Richard Samuel being molested consists of a declaration from Marie Alicon, a cousin, who states that Richard Samuel told her when he was in San Quentin that he was molested. We have a declaration from another cousin saying, Richard Samuel told me on the telephone, no date, that he was molested. And we have Richard Samuel stating in his declaration under penalty of perjury, I was not molested. When I was eight or nine years old, Uncle Chad tried to lure me into a room, and I said no. So if that's what the family is saying, how would the defense counsel or the investigator know at the time that there was any molest? In the declarations, not one of Richard Samuel's family members was molested. The extended family members certainly were molested, but not Richard Samuel's family. In addition, if you look at the declarations carefully, the main one that talks about the molest, the first one is Marie Alicon. She states, and Bernadine Severance, they both state they did not come out publicly about the molest until 1988. It was a family secret, and one of the other declarations from Raymond Reyes, who is Bernadine Severance's girlfriend, says that Bernadine was told not to talk about the abuse, not to talk about the molest. So we have a family that's not talking about it. Throughout the declarations, the family members that are talking about it say most of the families can deny about it and doesn't talk about it. This is one small aspect of the whole mitigation picture that they have. They also have a long history of physical abuse, including the stove incident and other things. That does not seem to be disputed. Again, though, if you look at what the, which goes to the prejudice, which I will address right now in terms of the deficient performance and what they knew, if you look at what the violence consists of, the immediate family members say, they talk about their mother. She was not affectionate, but they say she was a kitchen kind of mom. All the witnesses say she was always in the kitchen. She was cooking. She was cleaning. She was providing. She may be Harriet Nelson, for all I know. I'm talking about the father and the stove. Absolutely. And the father, again, the immediate family members say, he disciplined us when we misbehaved. They did not talk about being physically abused or beaten. One of the brothers says that they were sometimes hit by a belt. And two of the brothers talk about the stove incident. And that is one of those double-edged swords that would not have been something sympathetic or mitigating because one brother says. You're still talking about the issue that you had no notice that any of these things occurred, aren't you? Well, I'm talking, yes, in the sense that I want to talk about. What I'm talking about is that there's a difference between what the immediate family members said happened in terms of the abuse and the extended family members. All right. And this all goes to the issue of whether you had sufficient reason to investigate further, right? To continue to investigate further. Because the immediate family members were not talking about the abuse or minimal abuse. And the stove incident was that one of the brothers said that Richard Samioa and the brother killed a cat and the dad held his hand over a stove. The other brother said it was because the dad had been raising homing pigeons. Richard Samioa put gasoline on the homing pigeons, tossed them into the air, and the homing pigeons burned to death. And that's why his hand was put over a stove. So, really, there is nothing in the declarations that show that if you would have talked to other than the immediate family members, there would have been any indication or reason to think there was abuse. Richard Samioa's family was a very big family. His mother was the oldest of 11 children. His father came from a family of 10 children. So if you look, there's 21, well, there's them and 19 aunts and uncles. Is there any evidence that the lawyers asked their client, were you ever abused as a child? There is not. However, if you look at what Richard Samioa was telling people at the time, including... Well, telling people, I don't know about telling people. Did the lawyer ever say to him, were you ever abused? There's no evidence of that, that he asked one way or another. That's not a good fact for you, is it? Pardon? That's not a good fact for your side, is it, that there's no evidence that the lawyer made any inquiry of his own? Well, it's not our burden of proof to show. We don't have to prove that he didn't ask them. It's their burden of proof. So whether or not the lawyer asked him, we know that he was interviewed. We know that Mary Impossus interviewed him. And we know that Mary Impossus was trying to find out what it was that made him go astray. Let me shift gears for a second. Let's go to the prejudice prong for a minute. What is it that they have to show to get a due sentencing hearing in a sentencing trial? Excuse me. A reasonable probability of a different outcome in the trial. How do we... It's one way to articulate it. It's another thing to actually chew it and produce a result. How do we measure what's enough to cause a juror to say, okay, this guy deserves mercy despite all the bad stuff he did? If you look at the evidence in this case and the declarations, had these witnesses all been paraded in front of a jury and testified, what you would have had would have been the immediate family, as I said, talking about how, yes, there's some uncles who would get in fights. The only time the uncles were ever named, there's two of them, Uncle Pauly and Uncle Ralph. They were rowdy. They'd get in fights. They were good for nothing. They did work. But other than that, they were the rowdy ones. So you'd have Richard Samuela and Ted Samuela turn out these rowdy uncles and their family. They had a mother. They had a father. And their family was intact. The declarations, if you look at them, are mainly from Mercedes. She's the mother. Mercedes Samuela's family. Four of those declarations are from her sister Alice and Alice's three children, Alice Gribley. And what you would have seen, and those are the ones that really talk about this extended family of violence and the molest and all these things. So what you would have had is, and this is all just right out of the declarations, is Alice and her family talking about this terrible extended family. They all talk about how Alice got pregnant when she was 15. She had four children from four different men. When they were young, all four children were molested by Uncle Chad. When those children were young, they were placed in a foster home because Alice went to prison for welfare fraud. They went to their grandfather's house, which is also Richard Samuela's grandfather's house. I'm not following the point of what you're getting at here with this. Because you would have had this stark contrast of these families that didn't have a family father figure, that had four different fathers whose mother was in prison, who went to foster homes, who were molested, who were beaten by their mother, who were referred as bastards by their grandfather. And they said that when they didn't have enough food in the house, they would go to the Samuelas. They lived next door to the Samuelas. So what you would have would be this contrast of the witnesses who are making these declarations really had it bad compared and contrasted very starkly with Richard Samuela's family, whose mother provided. She was in the kitchen cooking and cleaning. The father was— That's not what the defense's witnesses would have said. They said about the father, he drank heavily at family parties and often wet his pants, that he was hard on the boys in the family. That's where he drank heavily. That's one of the witnesses. Yes, that was one of his extended cousins. No, but they were talking about, yes, about Richard's father. They were. And again— And then the next one says, a different one says, he would beat the shit out of the boys if he thought they needed it. He used a belt. He would beat Richard more because he was the oldest. In anger, his dad would hit him and keep hitting him because he did not cry. I mean, those are the witnesses they were going to present. Yes, those are what the extended family— Said about his father and his life. Yes. They observed. And if you accept that as true, you would also have the members of Richard Samuela's family that lived with him day in and day out that said, no, my father was a good man. He didn't beat us that way. Okay, suppose they believe the first version that Judge Reinhart just read. How do we know that wouldn't influence at least one juror to vote for life? The defense was stuck, in a sense, with what had been presented by the prosecution at the guilt phase with the family members who had turned him in. The evidence was in the guilt phase that his mother and two sisters had turned in Richard Samuela. They cooperated with the police. There's not a reasonable probability that one juror would say, wow, these really are terrible people, particularly when the people that really had it bad, that truly were molested, that truly came from a dysfunctional family, didn't turn out to commit these type of violent crimes. So the evidence is very, even if you believe that happened, it would not have overcome what the witnesses testified to in the guilt phase, basically a family sympathy defense that you can't have, you can't execute Richard Samuela because his family were basically good people and turned him in. It would have eviscerated that defense and they would have then had... I guess I didn't see the... I'm not sure I see how that argument works. There's no charge that the mother abused him, right? Correct. Or that the sisters abused him. Correct. And as I understand it, the turning in was by the mothers and sisters. Correct. Okay, so they could still be good people who turned him in. They were not, according to the story about the abuse and the molestation and the physical abuse, they wouldn't have been implicated. They would have been made no worse by that story. They would still have been victims, and I said it's victims of this abusive father. And I don't see the inconsistency. Why couldn't they bring evidence and say, you know, he had a fine mother and sisters, but they all suffered because the men in the family were highly violent, including the father, and some of them were sexually abusive? What's the contradiction there? Because what the declarations are saying is that the whole family environment was poisoned. The whole family environment produced, could do nothing but produce a criminal, yet it has produced. The brother also testified against him, I believe, that the family produced some law-abiding citizens. So it really doesn't. But there's no evidence that the brother was involved. I mean, the brother may have been a victim, but he was not perpetrated with violence or sexual abuse or anything of that sort. Correct. It's only the males in this family that are accused of being sexual molesters, beaters, wife beaters. The older males. The uncles. His mother. And his father. His mother, who you described as a fine woman, filed a declaration that said that he had, the defendant had, many head injuries throughout his childhood. When he was about two years old, the mother says, my brothers would toss him back and forth using him to play catch, and they would often drop him. His head hit the table. She goes down to all the other head injuries. When he was riding home from Bible study class, he was hit by a car. I mean, all the times he had these. But his uncles used to toss him back and forth and drop him on the floor. You must think that's true. That's correct. They did present evidence in the guilt phase of his brain injuries. And his uncles, tossing him, using him as a football, throwing him around and often dropping him on the floor. That's correct. And they did use, they did talk about his head injuries. But these are these uncles who were part of the immediate family. Yes. And that's the way he was treated physically by them. Yes. Those were uncles, Holly and Ralph, the two uncles who, and in fact I think there's a declaration from Uncle Ralph who said that he did that. Let me get back to my question. Assume that's true, how do we know that wouldn't make a difference if a juror heard this? The gravity of his crimes and the gravity of the aggravating evidence that I believe you described as atrocious, that he, here's a man who has a five-year-old child at the time, who smashed a two-year-old's child in and killed a two-year-old child as she's being held by her mother. The weight of the crimes, the weight of the aggravating evidence versus this evidence that, again, once you boil down what this evidence comes to, it's not particularly sympathetic to Richard Samioas. Let's talk a little bit about timing. Are you done with that question? I believe so, if I've answered it sufficiently. Yes, thank you. Do I understand correctly that the entire penalty phase investigation was conducted after the guilty evidence? That there wasn't much penalty stuff before the guilt phase? Marion Pofflis was involved in the case in, I believe, March of 87, and the penalty phase wasn't until April of 88. So, there was a penalty investigation ongoing, there's information that Michael Popkins had met with her early on. I believe what Your Honor is referring to is a note in the trial file of Michael Popkins after the guilt phase that said, starting to work on penalty phase. Well, that's what I'm trying to clarify, what that means. One of the concerns, and this is also near as a criminal case, is the possibility of getting continuance on the penalty phase. Now that they've got the guilt phase going badly on the guilt phase, do they now need to gear up a more thorough investigation on penalty? And the impression I get from reading the record here is that the lawyers were not that keen on the penalty. They didn't pay much attention to it at all, if any, before the guilt phase, and then all of a sudden pushing it afterwards. Clearly, the investigation was underway, as indicated by Marion Possess in her notes earlier, which, again, I believe was in March of 87, she was working on it. She was employed as a penalty phase investigator. So, it's certainly being worked on. I think if you look at the context, Michael Popkins had notes where his notes were pretty much vague, but he did have some notes prior of meeting with Marion Possess. So, it's clear that he was working on it ahead of time. There was a few weeks between the guilt phase and the penalty phase, and I think the cryptic note that Michael Popkins wrote clearly is referring to guilt phase is over, now I'm focusing on the penalty phase. It is not clear at all from the record that, in fact, to the contrary, it's clear he had been working on the penalty phase. Prior to that, the penalty phase investigation was ongoing. It's clear that she thought that there should be a continuance. Marion Possess declared later that she thought there should be a continuance. That's correct. Was there any strategic reason not to get continuance? I mean, there is an extended family that I'll ask people to talk to pursue some of these leads. Well, again, the investigation had been ongoing. Marion Possess, years later, says they should have gotten a continuance, but there's no declaration from defense counsel who did do a declaration regarding needing a continuance. So, I think it's speculative that they did need a continuance. The investigation had been ongoing. Marion Possess had indicated in her declaration she said they didn't uncover any of this abuse. She had, at the time, talked about how they were very close families. They don't give up much information. Michael Palkins told the court on the record he was pursuing a defense in the penalty phase of sympathy for the family because they had turned him in. He told the trial court that. He didn't indicate, and that wouldn't lead. Let's talk about the alcohol and the abuse. There's no doubt that this, at least as far as evidence we have now is concerned, this was not extended family stuff. This was something that was going on in the immediate family. Actually, defense counsel stated, Mr. Nimi stated that Samuel was using drugs at a very early age. His declaration stated that his uncle gave him beer and alcohol at 15 years old. So, he was in high school, according to him. Benny Girdley talked about how they were doing it. And, again, what you have is you have the extended family talking about what the Sam Ayoa family was doing, which is inconsistent with what the Sam Ayoa family said was going on. So, other people said he was using drugs and alcohol at an early age. He said it was 15. And along those same lines, if you look at the expert witnesses presented in this petition, Gretchen White, the expert witness, when she talked about, she had a whole section on family history and childhood, and she exclusively refers to the extended family, nothing from the immediate family. And same thing with the defense counsel. Defense counsel, who was the expert, basically Strickland expert, who said that these counsel were deficient and there was prejudice. When you look at what he relied on, he didn't rely on any information from the immediate family. He only relied on declarations from the extended cousins, which is telling. And, again, which would go to how persuasive would this really be when he was not given or didn't rely on for his own declaration what the immediate family said. So, in terms of drugs and alcohol, and, again, Gretchen White's report on drugs and alcohol, when she's citing the drugs and alcohol that were used by the defendant, by Sam Ayoa, she cites only to the declarations of the extended family members and virtually ignores Richard Sam Ayoa's declaration that he started using drugs and alcohol at a later point in time. She also, when talking about the molest, she accepts the extended family's statement that he was molested at face value and says he denies it, but then cites to an article that males have a harder time admitting they were abused or molested than females. Again, it would carry very little persuasive weight to have other people opining what Richard Sam Ayoa was doing at the time and having his immediate family saying otherwise. Do you have any view on the advisability of holding this case for the two or three cases on the Supreme Court, Pinholster, Victor, and I still want to mention, do you think we ought to hold those? To me, this case has some eerie similarities to Pinholster. It was tried by the same time, I believe. It was, and I believe there are some similarities to Pinholster, but I don't think you should hold off because of this reason. I think in Pinholster, there was much more real abuse. When you look at it here, there wasn't much to put in front of it. You used the word eerie, and I wanted to point out that along those lines, in defense counsel and appellant's brief, appellant Sam Ayoa's counsel stated that he thought this case was eerily similar to Velmonte's, and I would urge this court that it is more similar to Velmonte's. The abuse that there was has a double-edged sword, so I think that relying on that... Well, what I thought was similar about it was, and of course you know what I thought of Pinholster, but... I do. You smiled when you said it. I thought Pinholster was a pretty good decision. Well, but whether we like Pinholster or not, as of today, there's no off the circuit. And so, you know, I have to sort of feel this way. And I realize it's up for a search, so anything could happen, but what I found most similar about it, about the two cases, is not so much the thing that was left out, but the weakness of the litigation defense that was put on. Both in this case and in Pinholster, the family members came in, the mother here, the brother there, and I forget who all the witnesses were in Pinholster, but one or two other family members, I believe, came in, and sisters came in here. I mean, this was a very small family. We're law-abiding in both cases. We were really close to the family in both cases. And it's bad sheep out there, and the strategy, I believe, was the sort of pity for the family defense. The strategy was, these are good people, and don't punish them. Don't punish the mother, don't punish the sisters, by executing the perpetrator. Even though he might personally deserve it, take pity on this family and don't cause them any more pain. I thought that was the strategy in Pinholster, and I thought that was the strategy here. It seemed to be, and for better or for worse, the majority in Pinholster, in my view, said that was not good enough, that having the family come in and paint a rosy picture of the family life was false, arguably false. The rosy picture was just for some litigation defense. Well, I think that, I do see the similarity, and I think in Pinholster what they ended up saying was there was a false perception of the family life, because the mother presented them in a fairly good manner. Whereas here, they really didn't try to develop, there wasn't much developed about his family background. In front of the jury, it was more the effect on the family if Samuel were to be executed, because they turned him in. I think that I agreed with the analysis and the dissent in Pinholster, which I realize is a dissent, but that it would have been a lot of mudslinging back and forth and wouldn't have been very sympathetic. I think in this case, I agree that even more so based on the declarations and what the immediate family here was denying. My main reason why I don't think you should hold it up for Pinholster is that it is, in terms of looking at mitigation and ineffective assistance to counsel and whether or not there was prejudice, and I will say that we have the notice issue on deficient performance, or whether they would have known about it based on the closed family and that some of this stuff didn't come out. But in all these cases, you have to look at them on a case-by-case basis, and I don't think you can compare that in Pinholster that dad's childhood was at this level and here it was at this level. But even if you did look at it on a case-by-case basis, or if you did look at it and compare it to Pinholster, I think that the violence, the childhood in Pinholster was much worse than it was here. And again, if you weigh the aggravating evidence, the heinousness of the crime, against what sympathetic value these witnesses would have had, I think that there's not a reasonable probability of a different outcome. In Pinholster, there was neurological evidence that wasn't presented. There was also neurological evidence of brain injury that wasn't presented. So there was a whole other issue there. That's correct. Thank you. Thank you, Your Honor. One thing I would like to point out goes back to Marion Passes, as Your Honor was referencing her. One of the things she specifically stated was that the family, meaning the mother, was not forthcoming with the facts. Now, I don't really know how much more of a flare you can send up to counsel to say you can't rely on what the immediate family has to say. I mean, Alice Girdley turns around and states, counsel told me he didn't want to hear anything bad about the family. Well, that must mean that counsel had some suspicion that there was something bad about the family. Counsel from minute one. I don't know. He might just say, well, what I want to do is find out good things to say about the family. About this case of defense. The idea that, you know, I don't know why. And I'm just wondering, what was an investigator? I mean, ultimately, the judgment is glorious. And the kind of investigator that seems to think of moral investigation. You know, a guy with a hammer always thinks of his own as a man, right? So, as an investigator, we need moral investigation. I find that surprising. Well, the man who makes a decision, before he even conducts an adequate investigation, that there's nothing wrong with this family, is not fulfilling his duty under the United States Constitution or the mandates of the United States Supreme Court. I assume he's not required to presume that there's something wrong with the family, is he? Oh, there was many reasons to presume there was something wrong with his family. Part of the discovery in this matter, and it's in the excerpt of the records, is a report from Wake Griswold. Now, Wake Griswold was the psychiatrist for the prosecution who did serve confession. And in that report from Wake Griswold, Dr. Griswold says, wait a minute, there's something wrong with this guy. He lives in a fantasy world. He doesn't know the truth from fiction. He cannot be relied upon as a reliable historian. They knew from point one, from 1986, two years before the penalty phase, that nothing Mr. Samuel said to them could be relied upon. And, Your Honor, the one last thing I really want to... I'm guessing that not being able to rely on what they say is fairly common. You're a defense lawyer. You must rely on some of that. Well, I've been a prosecutor my past two years, and I ran into it there as well. But, yes, that is exactly why, as a defense attorney, and especially as a defense attorney in a capital case, you just can't stop because your client says, my mama was... What is your biggest and last flare here? I mean, just, if you were to point to a single item that a lawyer would have gotten, and then would have said, boy, you really need to dig further, just the one single, strongest item that you consider to be... Declaration of Marion Pasterak. She's an investigator. She's an investigator. Her personal judgment about this, if that's your strongest point, you haven't really got very much of my judgment. What is it that, of the things that they heard from the people that they talked to, that said, look, this is not enough, or there's some indication here that digging further is likely to be productive? Well, that's the whole point. Any of the witnesses they talked to, they did talk to a fairly extensive number of witnesses. They talked to everybody in the immediate family. Not the extended family, but the immediate family. Did anybody say anything about the sexual abuse? No. Okay. Did they say anything about the drugs or alcohol? No. Did they say anything about the beatings, the blood, any of that? Did they say anything of that? Not that I know of, Your Honor. There's nothing in the record. No, no. I certainly don't think that you can blame the lawyers back there for not knowing. I beg to differ, Your Honor. Is there any indication of, sort of, you know, the thing about playing football with a kid, and then dropping him on the side and all that? Is there any indication of that happening? No, Your Honor. Any mention of Uncle Fester? That would be Uncle Chad, Your Honor. Same guy. Same guy? Okay, I'll take your word for it, Your Honor. Chad, whatever, right. Any word about him? No, Your Honor. Okay, how about the two no-good uncles that were surviving? Any mention, any allusion to that? They didn't look. They didn't find out. You've got 19 aunts and uncles, and if you count spouses and significant others, plus cousins and all that, Chad, you're talking about other people or so, right, that are living in a sort of extended family, right? That's correct, Your Honor. But when your investigator, they obviously hired this person for a reason. I don't think they hired this pastor because they couldn't trust her or because her opinion was worth nothing. I mean, if her opinion was worth nothing and they hired her, well, there's ineffective assistance accounts right there. They hired this pastor because she was a trainer. And she said in her declaration she's done at least 25 pastor trainings. I do understand your argument. I'm not, you know, I understand as far as it goes. I understand what you're saying about her and deferring to her judgment. I'm just asking is, is it, and, you know, that takes you as far as it goes. Is there anything in the stuff that they did investigate, other than her personal feeling that she wasn't getting everything, that would say, gee, here is a flare. Here is something that tells me that if you just go a little bit further, you're going to find some real serious stuff. The nature of the crime itself, the fact that this man has done these violent things over and over again, that they were all, his crimes were all directed against women. I think Dr. Wade Griswold's statement about maternal dependency, I think all of these. I mean, this is not your average theft by deception case. This is a capital murder case. You simply can't stop where they stop. And, Your Honor, it's a plain fact, when you shut your eyes, you can't see. And this is what happened here. Counsel shut his eyes. He couldn't see. And now my able opponent says, well, what were you expecting him to do? Well, we should expect him to proceed with this case with his eyes open. He did not. Thank you very much. Thank you, sir.
judges: Kozinski, Reinhardt, Silverman